# In the United States Court of Federal Claims

No. 05-216C
Filed January 31, 2006
**TO BE PUBLISHED**

| | |
|---|---|
| JERRY C. MILLS d/b/a JCM TIMBER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.*;<br>Contract Modification;<br>Motion for Summary Judgment, RCFC 56(c);<br>Small Business Act, 15 U.S.C. §§ 631-651. |

**Orvis A. Shiyou, Jr.**, Shiyou Law Firm, Hattiesburg, Mississippi, counsel for Plaintiff.

**Steven M. Mager**, United States Department of Justice, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge***

Jerry C. Mills, doing business as JCM Timber Company, ("Plaintiff"), seeks monetary and equitable relief for the Government's alleged breach of a timber sale contract.

## RELEVANT FACTS[1]

On March 1, 2000, the United States Department of Agriculture Forest Service ("Forest Service") issued a Timber Sale Prospectus ("the Request"), requesting bids to purchase timber located in the Desoto National Forest, in Greene County, Mississippi. *See* Compl. Ex. A (Mar. 1, 2000 Timber Sale Prospectus). The Request specified a minimum acceptable dollar amount for

[1] The facts recited herein were derived from: the February 11, 2005 Complaint ("Compl.") and the Exhibits thereto ("Compl. Ex."); the Government's June 10, 2005 Motion for Summary Judgment, or, in the alternative, Motion to Dismiss Count Two ("Gov't Mot.") and the Appendix thereto ("Gov't App."); the Government's June 10, 2005 Proposed Findings of Fact ("Gov't PFF"); Plaintiff's August 18, 2005 Response to the Government's Proposed Findings of Fact ("Pl. Resp. PFF"); Plaintiff's August 18, 2005 Response ("Resp.") and the Exhibits thereto ("Resp. Ex."); and the Government's September 20, 2005 Reply to the Plaintiff's Brief in Opposition ("Reply").

certain timber: \$129.00 per CCF[2] of pine sawtimber; \$17.00 per CCF of hardwood sawtimber; \$26.00 per CCF of pine small roundwood; and \$1.00 per CCF of hardwood small roundwood. *See* Compl. Ex. A at 2. The Request also specified that the party awarded the Timber Sale Contract would be required to construct certain specified roads. *See* Compl. Ex. A at 3.[3] In addition, the Request indicated that the advertised price for timber did not include the cost of constructing any necessary roads and the awardee would be responsible for such costs, without reimbursement from the Forest Service. *See* Compl. Ex. A at 2-3.

On March 15, 2000, Plaintiff entered into Timber Sale Contract No. 303599 with the Forest Service ("the Contract"). *See* Compl. Ex. B (Mar. 15, 2000 Timber Sale Contract ). The Contract listed the following agreed upon timber rates: \$138.00 per CCF of pine sawtimber; \$18.00 per CCF of hardwood sawtimber; \$29.00 per CCF of pine small roundwood; and \$3.00 per CCF of hardwood small roundwood. *See* Compl. Ex. B at 24 (§ AT5b). The Contract specified a termination date of November 30, 2002. *See* Compl. Ex. B at 21. The Contract, however, provided for three circumstances where rate adjustments would be permissible: 1) pursuant to a scheduled rate redetermination, 2) because of modifications under the Forest and Rangeland Renewable Resource Planning Act of 1974 (16 U.S.C. § 1600), or 3) after catastrophic damage to the timber. *See* Compl. Ex. B at 34-35 (§§ CT3.31, CT3.312, CT3.32).

---

[2] A "CCF" is one-hundred cubic feet, which would be equivalent to 100 pieces of wood 12" wide by 12" long by 12" thick. *See* Timber Sale Program, U.S. FOREST SERVICE, http://www.fs.fed.us/gpnf/forest-administration/timber/timber99.html (last visited January 31, 2006).

[3] The Request allowed an awardee who qualified as a small business under the Small Business Act, 15 U.S.C. §§ 631-65, to elect to have the Forest Service construct the roads. *See* Compl. Ex. A at 10. Failure to make this request when submitting a bid, however, would bar an awardee from making a request at a later time. *See* Compl. Ex. A at 21. In his bid, Plaintiff did not check the box indicating a small business status and his desire to have the Forest Service construct the roads. *See* Pl. Resp. PFF ¶ 5.

On October 20, 2000, the Contracting Officer suspended the Contract, pursuant to § CT6.01,[4] because a different lawsuit was filed against the Forest Service, the subject of which included the timber at issue in the Contract. *See* Compl. Ex. D (Oct. 20, 2005 Letter). Section CT6.01 provides that, if a suspension, pursuant to this Section, exceeds 30 days, Plaintiff's "sole and exclusive remedy shall be . . . Contract Term Adjustment[,] pursuant to § BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations[.]" *See* Compl. Ex. B at 46. Although the Contract does not define "out-of-pocket expenses," § CT6.01 specifically excludes "lost profits, attorney's fees, replacement cost of timber, or other anticipatory losses suffered by Purchaser." *Id.*

Thereafter, Plaintiff requested, pursuant to § CT4.229, a refund of the down payment paid to the Forest Service when the Contract was executed.[5] *See* Gov't App. at 1 (Dec. 4, 2000 Letter). On December 4, 2000, the Contracting Officer sent Plaintiff a letter indicating that $35,600.00 of

---

[4] Section CT6.01 permits the Contracting Officer to suspend the Contract where the Purchaser:

> agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:
>
> (a) To prevent serious environmental degradation or resource damage that may require contract modification under [§] CT8.3 or termination pursuant to [§] CT8.2;
>
> (b) To comply with a court order, issued by a court of competent jurisdiction; or
>
> (c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Compl. Ex. B at 46.

[5] Division CT of the Contract permits the Contracting Officer to return a portion of the down payment in the event of a suspension:

> When, pursuant to [§] CT6.01 or [§] CT6.25[,] Contracting Officer requests Purchaser to interrupt or delay all or any portion of Purchaser's operations under this contract for more than 60 consecutive days, the downpayment amount being held on deposit may be temporarily reduced upon the written request of the Purchaser or at the discretion of the Contracting Officer. For the period of interruption or delay, the downpayment on deposit may be reduced to $1,000 or 2 percent of the downpayment amount listed in [§] CT4.220[,] whichever is larger.

Compl. Ex. B at 37 (§ CT4.229).

the down payment would be returned, with $1,000.00 being retained. *Id.* This letter also indicated that, before operations could resume under the Contract, the full down payment would need to be returned to Forest Service. *See* Gov't App. at 1.

On February 25, 2003, the Contracting Officer advised Plaintiff that the suspension was lifted and the balance of the down payment would have to be returned before operations could continue. *See* Compl. Ex. E (Feb. 25, 2003 Letter). Plaintiff also was informed that the Contract's termination date was extended to April 11, 2005. *Id.*

On April 16, 2003, Plaintiff presented a certified claim to the Contracting Officer, asserting that timber prices fell dramatically during the Contract's suspension, causing Plaintiff to incur a loss of $178,961.31.[6] *See* Compl. Ex. F (Apr. 16, 2003 Claim).

On May 14, 2003, the Contracting Officer responded reminding Plaintiff that repayment of the $35,743.67 down payment, including $118.67 in interest and $25.00 for administrative costs was past due. *See* Gov't App. at 22 (May 14, 2003 Letter).

On June 3, 2003, the Contracting Officer advised Plaintiff that he was entitled to submit a claim for out-of-pocket expenses incurred during the suspension and Forest Service planned to draft new proposed contract rates. *See* Compl. Ex. G at 1 (June 3, 2003 Letter). Plaintiff was further advised that if the parties "come to an agreement in these two matters," the Contracting Officer would "prepare an Agreement to Modify the Contract to formally establish the new [timber] rates." *Id.* On June 18, 2003, Plaintiff responded indicating that he would be prepared to repay the down

---

[6] Plaintiff's April 16, 2003 letter detailed the alleged loss:

| | | | |
|---|---|---|---|
| 1. | Cost of construction of the road: | | $101,855.09 |
| 2. | Interest on the construction cost: | | $ 16,095.42 |
| 3. | Loss of interest on down payment: | | $ 3,125.80 |
| 4. | Road construction taxes due to the State of MS | | $ 4,245.00 |
| 5. | Labor and Equipment Costs: | | $ 2,640.00 |
| 6. | Timber Cruise: | | $ 1,000.00 |
| 7. | Lost Profit: | | $ 40,000.00 |
| 8. | Attorney Fees: | | $ 10,000.00 |
| | | TOTAL: | $178,961.31 |

Compl. Ex. F at 2.

A "timber cruise" is "a statistical analysis of the volume of timber on a tract, which is obtained by taking plot samples at various intervals and extrapolating total volumes from those samples." *Hambleton Bros. Lumber Co.* v. *Balkin Enterprises, Inc.*, 397 F.3d 1217, 1223 n.1 (9th Cir. 2005) (citing VICTOR P. HALEY, SEEING THE FOREST AND THE TREES: BUYING AND SELLING TIMBERLAND, PROB. AND PROP., Sept./Oct. 1998, at 18, 19).

payment once new timber rates were agreed upon. *See* Compl. Ex. H (June 18, 2003 Letter). Plaintiff also reasserted the expenses itemized in the April 16, 2003 letter. *Id.*

In a letter dated July 7, 2003, the Contracting Officer informed Plaintiff an appraisal was completed and "if all parties accept a settlement," the contract timber rates would be set at: $92.04 per CCF of pine sawtimber; $31.62 per CCF of hardwood sawtimber; $9.41 per CCF of pine small roundwood; and $3.96 per CCF of hardwood small roundwood. *See* Compl. Ex. I at 1 (July 7, 2003 Letter). The Contracting Officer, however, did not enclose an Agreement to Modify with the July 7, 2003 letter. *See* Pl. Resp. PFF ¶ 39.

On July 11, 2003, the Contracting Officer sent another letter to advise Plaintiff that repayment of the down payment continued past due and enclosed a revised Bill for Collection in the amount of $36,421.33, which includes the deposit, plus $237.33 in interest, $50.00 in administrative costs, and a $534.00 penalty. *See* Compl. Ex. J (July 11, 2003 Letter). On August 1, 2003, Plaintiff paid this amount in full. *See* Compl. Ex. K (Aug. 1, 2003 Facsimile Transaction Receipt).

On May 7, 2004, the Contracting Officer sent Plaintiff a proposed Agreement to Modify that contained proposed timber rates different from those listed in the Contracting Officer's July 7, 2003 letter.[7] *See* Compl. Ex. L (May 7, 2004 Letter). Therein, the Contracting Officer explained that "[t]his proposal is the result of the recently published rule in the Federal Register for rate re-determination." Compl. Ex. L at 1; *see also* Modification of Timber Sale Contracts, 69 FED. REG. 18,813 (Apr. 9, 2004).

On May 21, 2004, Plaintiff responded to the proposed Agreement to Modify noting the inconsistency between the proposed timber rates in the Contracting Officer's July 7, 2003 letter and those included in the May 7, 2004 proposed Agreement to Modify. *See* Compl Ex. M (May 21, 2004 Letter).

On July 7, 2004, the Contracting Officer responded that the timber rates proposed in the July 7, 2003 communication were tentative and that final rates were contingent upon the Forest Service receiving the authority to make rate redeterminations. *See* Compl. Ex. N (July 7, 2004 Letter). The Contracting Officer explained that, prior to the April 9, 2004 interim rule, the Forest Service did not have authority to make a rate redetermination. *Id.*; *see also* Modification of Timber Sale Contracts, 69 FED. REG. 18,813 (Apr. 9, 2004).

On July 14, 2004, Plaintiff signed the May 7, 2004 proposed Agreement to Modify. *See* Compl. Ex. L at 2.

---

[7] The May 7, 2004 proposed Agreement to Modify listed the following timber rates: $138.00 per CCF of pine sawtimber; $18.00 per CCF of hardwood sawtimber; $11.91 per CCF of pine small roundwood; and $3.00 per CCF of hardwood small roundwood. *See* Compl. Ex. L at 2.

On November 12, 2004, the Contracting Officer issued a Final Decision on Plaintiff's April 16, 2003 certified claim. *See* Gov't App. at 2-6 (Nov. 12, 2004 Final Decision). Plaintiff was awarded $2,640.00 for labor and equipment costs incurred in connection with the contract's delay, but Plaintiff's other claims were denied, because they were determined not to constitute out-of-pocket expenses, within the meaning of § CT6.01 of the Contract. *See* Gov't App. at 2-6.

## PROCEDURAL HISTORY

On February 11, 2005, Plaintiff filed a Complaint in the United States Court of Federal Claims that was assigned to the undersigned judge. Count One alleges that the March 15, 2000 Contract was breached, because the Government failed to honor the new timber rates proposed in the Contracting Officer's July 7, 2003 letter and accepted by Plaintiff's August 1, 2003 payment of the revised Bill for Collection. *See* Compl. ¶ 24 ("The Defendant . . . has knowingly and willfully breached the Renegotiated Contract[,] which consisted of an offer by Defendant for the renegotiated contract terms after expiration of the original contract, acceptance by Plaintiff of those terms and sufficient consideration given by Plaintiff through his foregoing of his Claim for damages incurred under the Original Contract in exchange for acceptance of the Renegotiated Contract, by failure to abide by the terms of the Renegotiated Contract and instead, claim that the unacceptable and un-bargained for rates of the May 7, 2004 letter were operative."); *see also* Compl. ¶¶ 16-18 (detailing the alleged modification); Compl. Ex. M. As part of this claim, Plaintiff demands $101,855.09 for its road-construction costs. *See* Compl. ¶ 25. Plaintiff also seeks "sums for [Plaintiff's] interest on the road construction cost, loss of interest on [Plaintiff's] down payment, road construction taxes paid to the State of Mississippi, labor and equipment costs, timber cruise, [Plaintiff's] lost profit, and attorney's fees and all costs of the court." *Id.*

Count Two reasserts the claim for breach of the Contract, as modified, and demands that the court compel specific performance. *See* Compl. ¶¶ 27-28 ("Plaintiff avers that Defendant should abide by the terms of the Renegotiated Contract and Specific Performance of the same is sought under its terms[.]").

On June 10, 2005, the Government filed a Motion for Summary Judgment, or in the alternative, a Motion to Dismiss Count Two of the Complaint. On August 18, 2005, Plaintiff filed a Response. On September 20, 2005, the Government filed a Reply.

## DISCUSSION

### A. Jurisdiction.

#### 1. Tucker Act.

The Tucker Act provides the United States Court of Federal Claims with "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied

contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

In this case, there is no dispute that a contract existed between Plaintiff and the Government. *See* Compl. ¶ 8; Compl. Ex. B; *see also Trauma Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (To establish jurisdiction, a plaintiff "must show that either an express or implied-in-fact contract underlies its claim.").

**2. Contract Disputes Act.**

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978[.]" 28 U.S.C. § 1491(a)(2). The Contract Disputes Act, 41 U.S.C. §§ 601, *et seq* ., however, provides as a prerequisite to this court's jurisdiction, the plaintiff must exhaust available administrative remedies by first submitting a "claim" to the responsible contracting officer and obtaining a "final decision" from that contracting officer. *See* 41 U.S.C. § 605(a).

Although the Contract Disputes Act does not define "claim," that term is defined in the Federal Acquisition Regulation as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101; *see also* 48 C.F.R. § 52.233-1(c) (containing the same language). The United States Court of Appeals for the Federal Circuit has held that no particular formula or terminology is required:

> We know of no requirement in the [Contract] Disputes Act that a "claim" must be submitted in any particular form or use any particular wording. *All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.*

*Contract Cleaning Maint., Inc.* v. *United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) (citations omitted); *accord Transamerica Ins. Corp.* v. *United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992)

(explaining that the United States Court of Appeals for the Federal Circuit "has definitively stated that certain 'magic words' need not be used and that the intent of the 'claim' governs").

Existing case law, therefore, requires as a prerequisite to a "claim" that a contractor: make a written, non-routine demand to the Contracting Officer; request a final decision; and seek the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract.[8] *See England* v. *The Swanson Group*, 353 F.3d 1375, 1380 (Fed. Cir. 2004) (holding that the Armed Services Board of Contract Appeals lacked jurisdiction because the contractor failed to present to the contracting officer a "claim" within the meaning of the Contract Disputes Act); *James M. Ellett Constr. Co.* v. *United States*, 93 F.3d 1537, 1542-43 (Fed. Cir. 1996) ("[T]here are three requirements a nonroutine submission must meet to be a 'claim.' It must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain."); *see also* 48 C.F.R. §§ 2.101, 52.233-1(c).

The United States Court of Appeals for the Federal Circuit has "enforced the strict limits of the [Contract Disputes Act] as jurisdictional prerequisites to any appeal." *Swanson Group*, 353 F.3d at 1379 (internal quotation & citation omitted). Accordingly, "jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." *Swanson Group*, 353 F.3d at 1379; *see also James M. Ellett Constr.*, 93 F.3d at 1541-42 ("Thus for the [United States Court of Federal Claims] to have jurisdiction under the [Contract Disputes Act], there must be both a valid claim, a term the act leaves undefined, and a contracting officer's final decision on that claim.").

A "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." 41 U.S.C. § 605(b). A contractor may bring an action to the United States Court of Federal Claims within twelve months of the contracting officer's final decision. *See* 41 U.S.C. §§ 609(a)(1), (3).

**a. Plaintiff's April 16, 2003 Claim.**

On April 16, 2003, a detailed, certified claim was presented to the Contracting Officer, asserting that, as a result of a suspension of the Contract and a dramatic reduction in the price of timber, Plaintiff is entitled to be reimbursed for expenses incurred. *See* Compl. Ex. F. In addition, Plaintiff included a signed Statement of Good Faith, containing the information required by 41 U.S.C. § 605(c)(1). *See* Compl. Ex. F at 3. On November 16, 2004, the Contracting Officer issued a final decision, granting-in-part and denying-in-part Plaintiff's April 16, 2003 claim. *See* Gov't

[8] In addition, for contract claims against the Government exceeding $100,000.00, the contractor must certify that: the claim is made in good faith; the supporting data is accurate and complete; the amount requested accurately reflects the amount for which the contractor believes the Government is liable; and the certifier is duly authorized to certify the claim on behalf of the contractor. *See* 41 U.S.C. § 605(c)(1).

App. at 2-6. The twelve-month limitations period for Plaintiff to bring an action relating to the April 16, 2003 claim has since lapsed. *See* 41 U.S.C. §§ 609(a)(1), (3). Accordingly, the court does not have jurisdiction over Plaintiff's April 16, 2003 claim.

**b. Plaintiff's May 21, 2004 Claim.**

On May 21, 2004, Plaintiff sent a letter to the Contracting Officer, asserting that the Contract was modified on August 1, 2003, and therefore he was entitled to the modified contract rates. *See* Compl. Ex. M. Plaintiff explained that the Contracting Officer proposed this modification in two letters, dated June 3, 2003 and July 7, 2003, and Plaintiff accepted the Contracting Officer's offer by the payment made on August 1, 2003. *Id.* Plaintiff's May 21, 2004 letter also detailed the rates of the alleged modification and requested the Contracting Officer to respond within ten days. *See* Compl. Ex. M. Plaintiff also attached the July 7, 2003 letter, in which the Government is alleged to offer to modify the contract rates. *Id.* Although not as detailed as the April 16, 2003 certified claim, the May 21, 2004 letter contains a written demand for a final decision, seeking, as a matter of right, the adjustment of contract terms. *See* Compl. Ex. M; *see also Swanson Group*, 353 F.3d at 1380; *James M. Ellett Constr.*, 93 F.3d at 1542-43. Accordingly, the court has determined that the May 21, 2004 letter is a "claim" for the purposes of the Contract Disputes Act. *See* 41 U.S.C. § 605(a).

By a July 7, 2004 letter, the Contracting Officer responded there had been no modification to the Contract. *See* Compl. Ex. N. The Contracting Officer explained that it did not have the authority to make such a rate redetermination until an interim rule regarding "Modification of Timber Sale Contracts" was issued on April 9, 2004. *Id.* at 1; *see also* Modification of Timber Sale Contracts, 69 FED. REG. 18,813 (Apr. 9, 2004). In any event, the Contracting Officer explained that the parties failed to execute a written Agreement to Modify the Contract (Form FS-2400-9). *Id.* Accordingly, the court has determined that the July 7, 2004 letter from the Contracting Officer is a "Final Decision" for the purposes of the Contract Disputes Act. *See* 41 U.S.C. § 605(a).

The Complaint asserts the same legal theory that Plaintiff detailed on May 21, 2004 and the Contracting Officer denied on July 7, 2004 – namely that the parties modified the Contract on August 1, 2003 and that the Forest Service breached the Contract, as modified. *Compare* Compl. ¶¶ 16, 18, 24 *with* Compl. Ex. M, N. Additionally, the Complaint properly was filed within twelve months of the Contracting Officer's Final Decision, as required in the Contract Disputes Act. *See* 41 U.S.C. §§ 609(a)(1), (3). Accordingly, the court has jurisdiction to adjudicate Count One of the Complaint, Plaintiff's claim for money damages because of an alleged breach of the Contract, as modified.

The Government also asserts that the court lacks subject matter jurisdiction over Count Two of the Complaint because the United States Court of Federal Claims does not have jurisdiction over claims for specific performance. *See* Gov't Mot. at 21-23 (citing *United States* v. *King*, 395 U.S.

1, 4 (1969); *First Hartford Corp.* v. *United States*, 194 F.3d 1279, 1294 (Fed. Cir. 1999));[9] *accord* Reply at 7. Subsequently, Plaintiff withdrew Count Two. *See* Pl. Resp. at 17 ("Plaintiff concedes Defendant's Motion to Dismiss Count Two of Plaintiff's Complaint, *i.e.* that of Specific Performance." (italics added)). Therefore, the court dismisses Count Two of the Complaint and deems the Government's alternative argument moot. For the first time in its Response to the Government's Motion and a supporting Affidavit, Plaintiff alleges that he was:

> verbally assured by one of the engineers of the U.S. Forest Service[,] present at the signing of the contract on March 15, 2000, Jerry Holoway [sic], to the effect of 'don't worry about the roads' and that the Forest Service would either assist Plaintiff in the construction of the specified roads or provide Plaintiff with a credit towards the specified roads Plaintiff would construct on his own.

Pl. Resp. PPF ¶ 6; *see also* Resp. Ex. 5 (Mills Aff.: "I was verbally assured by Mr. Jerry Holliday, Road Engineer and Inspector for the Forest Service, that the Forest Service would supply me with timber credits in conjunction with building the roads required in this contract. I took the statements of Mr. Holliday to mean that the latter units of this sale would be paid from credits given upon completion and acceptance by Mr. Holliday of the required roads. I relied on Mr. Holliday's assurances that I would receive timber credits if I elected to build the specified roads."). Because this claim was not raised before the Contracting Officer, the court is also without jurisdiction to consider the merits of this allegation. *See Swanson Group*, 353 F.3d at 1379; *see also James M. Ellett Constr.*, 93 F.3d at 1541-42.

**B. Standard For Decision On Summary Judgment – RCFC 56(c).**

Summary judgment is "only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005); *see also* RCFC 56(c). In the United States Court of Federal Claims, summary judgment, albeit "interlocutory in nature, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c); *see also Winstar Corp.* v. *United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any). Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary

---

[9] Congress authorized the United States Court of Federal Claims to order declaratory and injunctive relief in a bid protest filed under 28 U.S.C. § 1491(b). *See* 28 U.S.C. § 1492(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.").

will not be counted . . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding that the moving party may meet its burden "by 'showing' – that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A motion for summary judgment may be made without supporting affidavits and rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation & citation omitted). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial."). A dispute over a material fact is "genuine" where a reasonable fact-finder could find for the non-movant. *See Anderson*, 477 U.S. at 248.

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). In doing so, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255; *Caterpillar Inc.* v. *Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *see also Gasser Chair Co., Inc.* v. *Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

## C. The Court's Resolution Of The Government's Motion For Summary Judgment.

### 1. There Are No Genuine Issues Of Material Fact.

Plaintiff argues that genuine issues of material fact preclude the court from resolving the Government's Motion for Summary Judgment. *See* Resp. at 4-6. Plaintiff identifies three "genuine issues of material fact[:]" (1) "whether the Defendant government agency, U.S. Forest Service, had the authority to modify the contract so as to allow for the lower rates commiserate [sic] with market price[;]" (2) "whether a valid contractual modification was present[;]" and (3) "whether Plaintiff can recover out of pocket expenses as . . . alleged in [the] April 16, 2003 request [to the Contracting Officer]." *Id.* at 6.

The issue of whether the Contract can be modified is governed by [§] BT8.3.[10] *See* Compl. Ex. B at 18 (§ BT8.3). The question of whether the Government had the authority to modify the Contract is a question of law. Likewise, the questions of whether the parties effected a valid contractual modification and whether Plaintiff can recover out of pocket expenses under the Contract are legal questions. Since no genuine issues of material fact exist in this case, summary judgment is an appropriate vehicle for disposition.

Having determined that this case involves questions of contract interpretation and does not present any genuine issues of material fact, the court next considers whether the Government is entitled to judgment as a matter of law. *See ECC Int'l Corp.* v. *United States*, 43 Fed. Cl. 359, 365 (Fed. Cl. 1999) ("Contract interpretation is a matter of law that is amenable to disposition on summary judgment." (citing *Textron Defense Sys.* v. *Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998); CORBIN ON CONTRACTS § 554 (1960) ("The question of interpretation of language and conduct-the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law."))).

**2. The Government Is Entitled To Judgment As A Matter Of Law.**

Plaintiff's claim for relief is premised on an alleged August 1, 2003 modification of the March 15, 2000 Contract. *See* Compl. ¶¶ 24, 25 ("The Defendant . . . has knowingly and willfully breached the Renegotiated Contract[.] As a result of said breach, Plaintiff has and continues to be deprived of his benefits under the contract, all to his detriment. "). Plaintiff does not assert a breach of the pre-modification rates or a breach of any of the other terms of the March 15, 2000 Contract. *Id.* Instead, Plaintiff contends that the March 15, 2000 Contract was modified on August 1, 2003, when Plaintiff "accepted" the Government's June 3, 2003 proposed new timber rates. *See* Compl. ¶¶ 14-16, 18; *see also* Resp. at 6-7 (On June 3, 2003, the Government "offered a proposal for new contract rates[, which] . . . constituted a formal offer to modify the existing contract[.]") (citing Compl. Ex. G). In a June 18, 2003 letter, Plaintiff agreed to this offer that allowed the Government to "continue to redetermine the contract rates for the remaining timber." Resp. at 7 (quoting Compl. Ex. H); *see also* Compl. ¶ 15. In a July 7, 2003 letter, the Government listed the revised contract rates calculated during an appraisal. *See* Compl. Ex. I. Plaintiff maintains that he accepted the Government's offer to revise the Contract rates, by responding affirmatively in its June 18, 2003 letter and by paying $35,421.33 to the Forest Service. *See* Compl. ¶¶ 16-18; Pl. Resp. PFF ¶¶ 40, 43; *see also* Compl. Ex. K.

---

[10] Section BT8.3 of the Contract provides, in part: "This contract can be modified only by written agreement of the parties except as provided under [§] BT8.31." *See* Compl. Ex. B at 18. Section BT8.31 of the Contract discusses the conditions by which the Forest Service may execute a "scheduled rate redetermination." *Id.* The March 15, 2000 Contract, however, does not permit the Forest Service to make a "scheduled rate redetermination." Compl. Ex. B at 26 (§ AT7 – Scheduled Rate Redetermination).

Modification of a contract is "'a change . . . which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed.'" *Carabetta Enterprises, Inc.* v. *United States*, 58 Fed. Cl. 563, 567 (Fed. Cl. 2003) (quoting *Int'l Bus. Lists, Inc.* v. *AT & T,* 147 F.3d 636, 641 (7th Cir. 1998)) (alterations in original). A contract modification must satisfy all of the elements required to form a contract. *See Int'l Bus. Lists*, 147 F.3d at 641. In determining whether a contract with the Government is modified, the court must ascertain: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Mgmt., Inc.* v. *United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997) (citations omitted); *see also Modern Sys. Tech. Corp*. v. *United States*, 979 F.2d 200, 202 (Fed. Cir. 1992) ("In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise."); *Fincke* v. *United States*, 675 F.2d 289, 295 (Ct. Cl. 1982) (discussing "the basic requirements" for a government contract (selected citation omitted)).

The June 3, 2003 and July 7, 2003 letters that Contracting Officer sent to Plaintiff do not evidence a "present intent" to modify the Contract. Specifically, the June 3, 2003 letter stated, in relevant part:

> I will soon be preparing an appraisal for this contract using standard [Forest Service] procedures. The purpose will be to determine proposed new contract rates for the remaining timber.
>
> You will also have an opportunity to submit to me a request for any out-of-pocket expenses you incurred during the period of the suspension . . . . The approved expenses will be divided by the remaining contract volume to establish a unit rate, and this amount will be deducted from the revised contract rates.
>
> * * *
>
> *If we come to an agreement in these two matters, I will prepare an Agreement to Modify the Contract to formally establish the new rates.* This Agreement would include a stipulation that you would relinquish any future claims pertaining to this particular situation.

Comp. App. G (emphasis added). This letter explained to Plaintiff the process by which the two parties might reach an agreement to modify the Contract rates. *Id.* In fact, the letter highlighted that such a modification was contingent on the parties first reaching an understanding on the new contract rates and the amount, if any, that the Government would reimburse Plaintiff for out-of-pocket expenses incurred during the suspension of the Contract. In addition, the July 7, 2003 letter notified Plaintiff that both parties would be required to execute an Agreement to Modify the Contract. *Id.*

Likewise, the July 7, 2003 letter advised:

> Processing this claim will take longer than expected. I am making every effort to resolve it as quickly as possible, but will require more time. To allow for any unforeseen delays, I estimate it will take no longer than 90 days.
>
> The appraisal part is completed. *The contract rates, if all parties accept a settlement, will be revised* to $92.04 for pine sawtimber, $31.62 for hardwood sawtimber, $9.41 for pine roundwood, and $3.96 for hardwoord roundwood. And contrary to my earlier letter, any approved out-of-pocket expenses will be paid in cash; they will not be pro-rated and subtracted from the contract rates.
>
> I will next review your claim for out-of-pocket expenses to determine which are permitted by the contract. However, *if you decide that the proposed revised contract rates shown above are not acceptable to you, please let me know.* Feel free to call if you have any questions.

Compl. Ex. I (emphasis added). This letter provided Plaintiff with an update on the Contracting Officer's process of preparing an offer to modify the Contract rates, but explained that the process was incomplete. *Id.* Of note is the Contracting Officer's disclosure that although "[t]he appraisal part" had concluded and the revised rates calculated, the review of Plaintiff's claim for out-of-pocket expenses was not complete. *Id.* In fact, the letter explained that negotiations for any modification of the Contract rates were still ongoing. *Id.*

Read in context, these letters include several significant contingencies before a modification could be accomplished. *See, e.g.,* Compl. Ex. G ("*If* we come to an agreement in these two matters, I will prepare an Agreement to Modify the Contract to formally establish the new rates.") (emphasis added); Compl. Ex. I ("*[I]f* you decide that the proposed revised contract rates shown above are not acceptable to you, please let me know.") (emphasis added). Moreover, the June 3, 2003 letter discusses a three-step process for modifying the Contract rates: 1) an agreement on the revised rates; 2) an agreement on the claim for out-of-pocket expenses; and 3) executing an Agreement to Modify the Contract. *See* Compl. Ex. G. Similarly, the July 7, 2003 letter provided Plaintiff with an update on the process, as discussed in the June 3, 2003 letter. *See* Compl. Ex. I ("The contract rates, *if* all parties accept a settlement, will be revised[.]" (emphasis added)).

As a matter of law, without evidence of "present intent" by the Government to modify the contract, the court cannot conclude that the March 15, 2000 Contract was modified on August 1, 2003. *See Modern Sys. Tech.*, 979 F.2d at 202 (holding that an agreement did not create binding rights and obligations because the "plain language of the [the agreement] . . . appears to be contemplative of future contracts [and] [t]here is no language indicating any present intent that either party be bound"). Accordingly, the Government is entitled to judgment as a matter of law.

## CONCLUSION

For the aforementioned reasons, the Government's Motion for Summary Judgment is **GRANTED**. The Clerk of the United States Court of Federal Claims is **DIRECTED** to enter judgment in favor of the Government.

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**